UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS, et al.,
on behalf of themselves and all
individuals similarly situated,

    Plaintiffs,

v.                           Civil Action No. 3:18-mc-1

BIG PICTURE LOANS, LLC, et al.,

    Defendants.


### MEMORANDUM OPINION

This matter is before the Court on MATT MARTORELLO'S NOTICE OF MOTION AND MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO ARANCA US, INC. (ECF No. 1). For the reasons set forth below, the motion will be denied.

### BACKGROUND

#### A. Factual Background

This action—and the primary case to which it is related, <u>Lula Williams, et al. v. Big Picture Loans, LLC, et al.</u>, 3:17-cv-461—revolves around the role of Matt Martorello ("Martorello") in the creation of a lending business, Big Picture Loans, LLC ("Big Picture"), by the Lac Vieux Desert Band

of Lake Superior Chippewa Indians ("the Tribe").[1] Big Picture offers short-term, high-interest loans through its website. Before Big Picture was formed, Bellicose Capital ("Bellicose"), a company in which Martorello had a significant ownership stake, provided marketing, underwriting, and related services to another lending entity that the Tribe had created. Then, in January 2016, Bellicose was purchased by a separate tribal entity, Tribal Acquisition Company, LLC ("TAC"). TAC dissolved after transferring control of Bellicose to another tribal entity, Tribal Economic Development Holdings, Inc. ("TED"). As part of this transaction, the Tribe and another company, which is managed by a separate entity of which Martorello is president, entered into a note requiring variable payments over the course of a seven-year term ("the Note"). Martorello Certification (ECF No. 1-1) ¶¶ 3-4.

Given the complicated nature of the transaction and the possibility of audits and litigation based on the terms of the Note, Martorello's tax attorneys recommended that he engage a

---

[1] The parties have developed an extensive factual record in the related case about the events surrounding the creation of Big Picture, primarily in connection with DEFENDANTS BIG PICTURE LOANS AND ASCENSION TECHNOLOGIES' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (ECF No. 22). However, the facts described here are limited to those needed to give context to Martorello's motion to quash.

third party to provide a valuation of the Note. Id. ¶ 5. The parties dispute whether Martorello or Bellicose engaged Aranca, Inc. ("Aranca") to complete that valuation. Plaintiffs highlight the report prepared by Aranca ("the Valuation Report"), which states that Aranca "has been engaged by Bellicose . . . to conduct valuation analysis and prepare a written report to express an opinion on the 'Fair Market Value' [of] [Bellicose]." Valuation Report (ECF No. 8-2) (Under Seal) at 5. In contrast, Martorello asserts that he engaged Aranca, and the engagement letter between Aranca and Kairos PR, LLC ("Kairos")—an entity of which Martorello was the president—says that Kairos "desires to retain A[ranca] to perform certain designated valuation services . . . and to provide [Kairos] with a certain valuation report." Engagement Letter (ECF No. 12) at 1; Martorello Certification ¶ 6. In any event, after Aranca was engaged, Martorello provided it with certain documents, including the documents at issue here, to enable Aranca to accurately valuate the Note. In addition, Martorello's attorneys at times interacted directly with Aranca's employees about the valuation. Martorello Certification ¶¶ 7-8. Aranca then completed the Valuation Report on May 5, 2017. Valuation Report at 1.

**B. Procedural Background**

On June 22, 2017, Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix Gillison, Jr. ("Plaintiffs") brought suit in the related case against Big Picture, Martorello, and other tribal entities and officials, alleging that they violated the Racketeer Influenced and Corrupt Organizations Act and Virginia usury laws by conspiring to offer loans to Plaintiffs and other Virginia residents at extremely high annual percentage rates without obtaining the requisite licenses to do so. After Defendants indicated that they would seek dismissal of the Complaint for lack of subject matter jurisdiction and personal jurisdiction, among other grounds, the Court ordered the parties to conduct jurisdictional discovery. Sept. 1 Order (ECF No. 17, Docket No. 3:17-cv-461). The Court later rejected Defendants' objections to Plaintiffs' third-party subpoenas on the basis that they were "intended to frustrate business operations." Oct. 18 Order (ECF No. 49, Docket No. 3:17-cv-461) at 3; see also Oct. 16 Transcript (ECF No. 48, Docket No. 3:17-cv-461) at 23:4-25.

Martorello produced a copy of the Valuation Report in the course of jurisdictional discovery. Then, on October 27, 2017, Plaintiffs served a subpoena on Aranca ("the Subpoena") that sought, in relevant part: (1) "[a]ll documents submitted

4

by . . . Martorello . . . as part of [Aranca's] engagement with Bellicose"; (2) "[a]ll documents submitted by any third parties that were reviewed and/or considered by [Aranca] as part of [its] business valuation of Bellicose"; and (3) "[a]ll e-mail correspondence between any employee, officer, director, and/or representative of Aranca and . . . Martorello." Subpoena (ECF No. 7-2), Ex. A ¶¶ 1-2, 6. The Subpoena required Aranca to produce the requested documents by November 15, 2017. Subpoena at 1. However, after conferring on November 10, Plaintiffs' counsel, Andrew Guzzo ("Guzzo"), and Aranca's counsel, Fenn Horton III ("Horton"), agreed to extend Aranca's deadline to respond to November 30. Horton then sent Aranca's objections to the Subpoena to Guzzo on November 22. The objections stated in part that certain requests called for information protected by the attorney-client privilege and work-product doctrine. <u>See,</u> <u>e.g.</u>, Subpoena Objections (ECF No. 1-1) at 9.[2]

On November 27, Martorello's counsel contacted Aranca's counsel to notify them that some of Aranca's documents were privileged and should be withheld at Martorello's direction. Boughrum Decl. (ECF No. 12-1) ¶ 8. Then, on November 29, Martorello's counsel, Richard Scheff ("Scheff"), notified Guzzo

---

[2] All page numbers associated with ECF No. 1-1 refer to the numbers automatically assigned by ECF.

that he had identified responsive documents in Aranca's possession that were subject to the attorney-client privilege, and that Martorello intended to file a motion for a protective order, or to quash, "by early next week." ECF No. 7-6 at 2.[3] Then, on December 1, Martorello provided Plaintiffs with a privilege log containing 102 documents, asserting that every document therein was protected by the attorney-client privilege, and two also by the work-product doctrine. Boughrum Decl. ¶ 10; Privilege Log (ECF No. 1-1) at 20-22.

When Aranca did not produce any documents by November 30, Guzzo contacted Horton, who expressed his understanding that there was an agreement to give Bellicose "a few more days" to move for a protective order regarding the Subpoena, and that Aranca did not need to respond until that motion was resolved. ECF No. 7-6 at 6. After Guzzo clarified Plaintiffs' expectations, Aranca still did not produce the documents. On December 5, Horton indicated that he was separating non-privileged documents (which would be produced) from privileged documents (which would be withheld pending resolution of "Bellicose's" expected motion). However, he further stated that, if he was "not served soon with [that motion]," he would

[3] All page numbers in this and other exhibits related to counsel's e-mail exchanges are the page numbers automatically assigned by ECF.

consider that failure "a waiver of the privilege by Bellicose" and would produce both privileged and non-privileged documents. Id. at 2. Aranca subsequently produced the non-privileged documents on December 8, Boughrum Decl. ¶ 15, but it is still withholding the purportedly privileged documents.

On December 7, Martorello's counsel suggested a meet-and-confer to Plaintiffs' counsel about Martorello's privilege claims. The parties agreed to table that discussion so that Plaintiffs could focus on an upcoming filing deadline in the related case. The meet-and-confer did not occur until December 11. Martorello's counsel then notified Plaintiffs' counsel on December 19 that Martorello did not agree with Plaintiffs' arguments. Id. ¶¶ 14, 16-17.

Martorello finally moved to quash the Subpoena on December 21, 2017. ECF No. 1. He filed the motion in the Northern District of California, where the Subpoena requires Aranca's compliance. See Subpoena at 1; Fed. R. Civ. P. 45(d)(3)(A). After the motion became ripe, that court transferred it here on February 6, 2018 finding that "exceptional circumstances" existed because this Court issued the orders governing the scope of jurisdictional discovery, under which Plaintiffs served the Subpoena. See ECF Nos. 14-15; Fed. R. Civ. P. 45(f).

## DISCUSSION

The Subpoena was issued pursuant to Fed. R. Civ. P. 45. Under that rule, a subpoena can demand "production of documents, electronically stored information, or tangible things at a place within 100 miles of where the [recipient] resides, is employed, or regularly transacts business." Fed. R. Civ. P. 45(c)(2)(A). However, "[o]n timely motion," a court "must quash or modify a subpoena that," as relevant here, "requires disclosure of privileged or other protected matter, if no exception or waiver applies." Id. 45(d)(3)(A)(iii). Courts have broad discretion in determining whether a movant has established that predicate. See Cook v. Howard, 484 F. App'x 805, 812 (4th Cir. 2012) ("District courts are afforded broad discretion with respect to discovery generally, and motions to quash subpoenas specifically.").

The Court must first decide whether Martorello has standing to quash the Subpoena. The Subpoena is, of course, directed at Aranca, and not Martorello, who is a party in the related case. "Ordinarily, a party does not have standing to challenge a subpoena issued to a nonparty unless the party claims some personal right or privilege in the information sought by the subpoena." Singletary v. Sterling Transp. Co., 289 F.R.D. 237, 239 (E.D. Va. 2012) (quoting United States v. Idema, 118 F. App'x 740, 744 (4th Cir. 2005)); see also Green v. Sauder

8

Mouldings, Inc., 223 F.R.D. 304, 306 (E.D. Va. 2004).[4] Here, Martorello has credibly asserted that some documents requested in the Subpoena are protected by the attorney-client privilege and the work-product doctrine. Whether those privilege claims should prevail is a separate question that concerns the merits of Martorello's motion to quash, not his standing to bring it. Furthermore, Martorello is "a party-[d]efendant] to th[e] litigation, with interests adverse to Plaintiff[s]." Green, 223 F.R.D. at 307. Thus, as in Green, Martorello has standing to challenge the Subpoena on privilege grounds.

## I. Alleged Deficiencies of Subpoena

Before discussing the substance of his privilege claims, Martorello notes two mistakes by Plaintiffs that, he claims, are fatal flaws to the Subpoena. First, he argues that the Subpoena

---

[4] In their briefs, the parties rely primarily on case law from the Ninth Circuit discussing Martorello's ability to bring the motion to quash and the substance of his privilege assertions. Rule 45(f) is silent about which law binds transferee courts that are deciding a transferred motion—the law of the circuit in which the transferee court sits, or the law of the circuit where the subpoena will be enforced. Nonetheless, transferee courts have uniformly relied on their own circuits' law. See, e.g., Williamson v. Recovery Ltd. P'ship, No. 2:06-CV-292, 2016 WL 4920773, at *1-*3 (S.D. Ohio Sept. 15, 2016); United States ex rel. Ortiz v. Mount Sinai Hosp., 169 F. Supp. 3d 538, 543-45 (S.D.N.Y. 2016); Ameritox, Ltd. v. Millennium Health, LLC, No. 15-CV-31-WMC, 2015 WL 420308, at *1 & n.1, *2 (W.D. Wis. Feb. 2, 2015); Wells v. Lamplight Farms Inc., 298 F.R.D. 428, 432-34 (N.D. Iowa 2014). Similarly, the Court relies on Fourth Circuit precedent to guide its analysis, but considers the Ninth Circuit case law as persuasive authority.

is "procedurally deficient" because it seeks documents relating to a party, Martorello, that has not asserted jurisdictional defenses, and which have no bearing on other Defendants' jurisdictional arguments. Thus, Martorello says, the Subpoena is merits discovery masquerading as jurisdictional discovery, and Plaintiffs have not engaged in the Rule 26(f) conference required to engage in that merits discovery. Second, Martorello asserts that the Subpoena is "substantively deficient" because it states that Aranca must produce documents pursuant to Rule 34, rather than Rule 45, and this error is not harmless.

Both arguments are misguided. Martorello's first contention misunderstands the scope of the jurisdictional discovery authorized by the Court. Martorello concedes that Plaintiffs are permitted to serve subpoenas as a part of jurisdictional discovery, as the Court has already recognized. See Oct. 16 Transcript at 23:20-22 ("[]I]t's perfectly all right to use any procedural vehicle authorized by the Federal Rules of Civil Procedure in pursuit of the discovery about a jurisdictional issue . . . ."). He contends, however, that documents relating to the Valuation Report could not be relevant to the jurisdictional issues because Martorello himself has not asserted any jurisdictional defenses, and the privileged information only concerns Martorello's tax planning. But these

relevance assertions are belied by the fact that Martorello himself produced the Valuation Report in the course of jurisdictional discovery because it contained information about Bellicose's operations. Consequently, it is reasonable for Plaintiffs to believe that communications and documents sent by Martorello to Aranca reasonably can be expected to shed light on Bellicose's operations, and thus it was reasonable for Plaintiffs to seek those documents from Aranca. Therefore, the Subpoena did not exceed on its face the scope of jurisdictional discovery.

Martorello's second argument overlooks the language of the full Subpoena that Aranca received. Exhibit A to the Subpoena states that Aranca is required to produce the requested documents pursuant to Rule 34. But that exhibit is attached to a form subpoena, which notes throughout that Aranca's obligations are set by Rule 45, and even includes a full page with the relevant text of that rule. See Subpoena at 1, 3. As a result, Aranca would have been fully aware that the rule number mentioned in Exhibit A was a typographical error, which does not make the Subpoena substantively deficient. Thus, both of Martorello's facial attacks on the Subpoena fail, and the Court must turn to the merits of his motion.

II. **Timeliness of Martorello's Objections and Motion to Quash**

As an initial matter, Plaintiffs assert that the Court cannot consider Martorello's assertions of privilege because: (1) neither Aranca nor Martorello timely objected to the Subpoena, thus waiving any privilege objection; and (2) Martorello did not timely file his motion to quash. Those arguments are addressed in turn below.

### A. Timeliness of Objections

A subpoena recipient can assert objections, but they "must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B). Normally, failure to object timely waives any objection, including privilege. Bell Inc. v. GE Lighting, LLC, No. 6:14-CV-00012, 2014 WL 1630754, at *9 (W.D. Va. Apr. 23, 2014); see also In re Motorsports Merch. Antitrust Litig., 186 F.R.D. 344, 349 (W.D. Va. 1999) (citing cases). Untimely objections may, however, be considered in "unusual circumstances and for good cause shown," including "where counsel for the nonparty and for the subpoenaing party were in contact with respect to the nonparty's compliance prior to the time the nonparty challenged the subpoena." Bell, 2014 WL 1630754 at *9 (internal quotations omitted).

Aranca's objections were clearly untimely. The Subpoena was served on October 27, 2017, and the original production date was November 15. The parties later agreed to extend that deadline to November 30. But the parties' agreement cannot change the plain language of Rule 45, which requires objections to be served "before the earlier of" the production date or 14 days after service of the subpoena. Fed. R. Civ. P. 45(d)(2)(B). Accordingly, Aranca needed to object before November 10, 14 days after October 27 or secure an extension of time from the Court. The parties' communications do not indicate that the extension of the production date was also intended to apply to Aranca's objections. Indeed, Horton did not appear to be aware that Aranca was in non-compliance with Rule 45 when he served the objections on November 22. See ECF No. 7-5 at 9. Under the circumstances presented by the record, the Court can find no good cause to consider Aranca's objections, and they must be considered waived.

However, Aranca's waiver of its objections does not affect Martorello's privilege claims. "A party cannot object to a subpoena duces tecum served on a nonparty, but rather, must seek a protective order or make a motion to quash." Moon v. SCP Pool Corp., 232 F.R.D. 633, 636 (C.D. Cal. 2005). In other words, even though Aranca waived any privilege objections that it might

have, Martorello could still have preserved his privilege challenges by timely moving to quash. Whether Martorello's privilege arguments can be entertained, therefore, depends on whether his motion was timely.

### B. Timeliness of Motion to Quash

A movant must satisfy the threshold requirement of filing a "timely motion" before a court can quash a subpoena under the mandatory provisions of Rule 45(d)(3). See Fed. R. Civ. P. 45(d)(3)(A). That rule does not explain what makes a motion timely, so district courts have developed two approaches to decide the timeliness of a motion to quash. Under the older approach, the motion must be filed within the 14-day deadline for serving objections set by Rule 45(d)(2)(B). See, e.g., Tutor-Saliba Corp. v. United States, 30 Fed. Cl. 155, 156 (1993); see also WM High Yield v. O'Hanlon, 460 F. Supp. 2d 891, 894 (S.D. Ind. 2006) (summarizing cases). Most courts, however—including courts within the Fourth Circuit—consider a motion timely if it is filed before the return date of the subpoena. See, e.g., Flynn v. Square One Distribution, Inc., No. 6:16-MC-25-ORL-37TBS, 2016 WL 2997673, at *1 (M.D. Fla. May 25, 2016); Carter v. Archdale Police Dep't, No. 1:13CV613, 2014 WL 1774471, at *3 (M.D.N.C. May 2, 2014); WM High Yield, 460 F. Supp. 2d at 894-95; Nova Biomedical Corp. v. i-STAT Corp., 182 F.R.D. 419,

14

422 (S.D.N.Y. 1998). Applying that test, courts have found motions to quash untimely not only "when filed months after the date of a subpoena's service or its deadline for compliance," Bell, 2014 WL 1630754, at *10, but also when they were filed mere days after the return date, see City of St. Petersburg v. Total Containment, Inc., No. 06-20953CIV, 2008 WL 1995298, at *2 (E.D. Pa. May 5, 2008) (movant did not move to quash subpoena until day after return date despite learning about it thirteen days earlier); cf. Joplin Sch. v. P1 Grp., Inc., No. 3:15-CV-05026-DGK, 2016 WL 3512262, at *1 (W.D. Mo. June 22, 2016) (movant knew about noticed deposition for two weeks, but did not file motion to quash until three days before deposition).

Here, Martorello's motion is untimely under either approach. It was not filed until December 21, well after the 14-day objection deadline of November 10. Likewise, the motion was filed more than a month after the original return date of November 15, and several weeks after the amended return date of November 30. Consequently, Martorello's motion is not timely within the meaning of Rule 45(d)(3)(A).

Neither of the arguments that Martorello makes in response is compelling. He first asserts that his motion was timely because it was filed by December 8, when Aranca produced the non-privileged documents in response to the Subpoena. Yet

15

Martorello misreads both cases cited in support of that proposition: <u>Moore v. Chase, Inc.</u>, No. 1:14-CV-01178-SKO, 2015 WL 4393031 (E.D. Cal. July 17, 2015) and <u>Internmatch, Inc. v. Nxtbigthing, LLC</u>, No. 14-CV-05438-JST, 2016 WL 1212626 (N.D. Cal. Mar. 28, 2016). The phrase "date of production" in both those cases does not refer to the date on which documents were <u>actually produced</u> in response to the subpoena, but instead, the production date identified <u>on the face of the subpoena</u>—that is, the return date. <u>See Internmatch</u>, 2016 WL 1212626, at *2; <u>Moore</u>, 2015 WL 4393031, at *6. Accordingly, those cases only adopt the dominant interpretation of timeliness noted above, under which Martorello's motion is untimely.[5]

Martorello's contention that any delay from his late filing can be disregarded is unconvincing because Martorello must show "'unusual circumstances'" or other good cause for the untimely filing. <u>Chao v. Aurora Loan Servs., LLC</u>, No. C 10-3118 SBA LB, 2012 WL 5988617, at *2 (N.D. Cal. Nov. 26, 2012) (quoting <u>Moon</u>,

---

[5] Martorello's contrary interpretation of those cases makes no sense, as it would mean that a person in receipt of a subpoena could conceivably wait any amount of time before producing documents—even a year—and a motion to quash would be timely if filed at any time before the eventual date of production. This approach would thus produce results that are inconsistent with the commonly-accepted understanding of timeliness and that undermine the goal of efficient discovery underlying Rule 45.

232 F.R.D. at 636).[6] But he has provided no plausible explanation for his counsel's repeated delays, even after conferring with Plaintiffs' counsel. Because Martorello is a party in the related case, he would have first become aware of the Subpoena on or around October 27, when it was served on Aranca. See Fed. R. Civ. P. 45(a)(4). Martorello did not discover the purportedly privileged documents until November 27, apparently because of Aranca's slow response to the Subpoena. Martorello's counsel, Scheff, conferred with Plaintiffs' counsel on November 29. Then, despite Scheff's statement that Martorello would move to quash the Subpoena "by early next week," Martorello's counsel for some reason did not initiate another meet-and-confer until December 7—a week after the agreed-upon production date had already passed. And, even after the meet-and-confer occurred, Martorello's counsel did not formally reject Plaintiffs' privilege arguments until December 19, a further delay of eight days. Therefore, this situation is nothing like the one in Hartz Mountain Corp. v. Chanelle Pharmaceutical Veterinary Products

---

[6] It is unclear if this exception is even applicable to untimely motions to quash, as Moon was discussing exceptions to untimely objections to subpoenas. See 232 F.R.D. at 636. The timeliness analysis for objections, under Rule 45(d)(2)(B), is different than the timeliness inquiry for motions to quash, under Rule 45(d)(3)(A). Bell, 2014 WL 1630754, at *9. Nonetheless, the Court will assume that the exception applies in order to address Martorello's argument.

Manufacturing Ltd., 235 F.R.D. 535 (D. Me. 2006), where an untimely motion to quash was excused because the delay resulted from the movant's "attempts . . . come to an agreement . . . on the terms of a confidentiality order covering the documents sought by the subpoena." Id. at 536. Plaintiffs made their disagreement with Martorello's position clear at the outset of the discussions with his counsel, and Martorello simply dragged his feet in investigating or responding to Plaintiffs' arguments. Engaging in fruitless meet-and-confers is not the same as negotiating an agreement for document production.

This result does not change because Martorello's untimely filing might not have prejudiced Plaintiffs in the related case. Rule 45(d)(3)(A) does not provide that prejudice (or lack thereof) to the party serving the subpoena is a consideration in deciding if a motion to quash is timely. The only court to have considered it as a factor relevant to timeliness did so in the context of the good cause analysis detailed in Moon. See Chao, 2012 WL 5988617, at *2. And, for the reasons noted above, Martorello has not shown good cause to excuse his untimely motion. Accordingly, Martorello's motion can be denied for its untimeliness alone.

## III. Martorello's Claims of Privilege

Even if Martorello's motion were timely, it fails on the merits, because Martorello has not demonstrated that either the attorney-client privilege or the work-product doctrine apply to the documents listed in the privilege log.

### A. Attorney-Client Privilege

The attorney-client privilege is "[i]ntended to encourage 'full and frank communication between attorneys and their clients.'" Solis v. Food Emp'rs Labor Relations Ass'n, 644 F.3d 221, 226 (4th Cir. 2011) (quoting Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)). A party asserting the privilege bears the burden of demonstrating the following elements:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or is his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

NLRB v. Interbake Foods, LLC, 637 F.3d 492, 501-02 (4th Cir. 2011) (internal quotations omitted). The Fourth Circuit has

emphasized that "the privilege is not absolute," but instead must be "strictly confined within the narrowest possible limits consistent with the logic of its principle." Solis, 644 F.3d at 226 (internal quotations omitted).

Martorello's privilege log provides enough information to assess his numerous attorney-client privilege claims. See Interbake Foods, 637 F.3d at 502. The parties' disagreement, though, concerns two different aspects of the privilege: (1) whether Martorello engaged Aranca, and is thereby the client who has standing to assert the privilege; and (2) whether, if Martorello does have standing, he waived the privilege by providing the communications at issue to Aranca.

### 1.    Standing

The party claiming the privilege must be a client who has sought legal advice. See id. at 501-02. The word "client" carries two meanings within the context of this dispute: someone must have been a client of the attorneys named in the privilege log, and someone (not necessarily the same person) must have been a client of Aranca. Martorello contends that he is the client in both senses; he had previously engaged his tax attorneys, and then engaged Aranca at his attorneys' direction to properly valuate the Note for tax purposes. Plaintiffs, on the other hand, assert that, although Martorello may have

20

engaged the attorneys with whom he made the underlying communications, Bellicose was Aranca's client because Bellicose engaged Aranca to complete the valuation. Therefore, Bellicose is the true holder of any privilege that attached to communications between Martorello and Aranca in which Martorello forwarded confidential communications. Because control of Bellicose was transferred to TAC and then TED, "the authority to assert and waive [Bellicose]'s attorney-client privilege" has likewise passed to TED's current management. See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 349 (1985).

Assuming that Martorello himself had an attorney-client relationship with his tax attorneys,[7] he has not shown that he was also Aranca's client. The record reflects that three different parties might have engaged Aranca. First, the Valuation Report states that Aranca "has been engaged by Bellicose . . . to conduct valuation analysis and prepare a written report to express an opinion on the 'Fair Market Value' [of] [Bellicose] along with allocation of 'Fair Market Value' between [Bellicose's] tangible and intangible assets." Valuation

---

[7] That client could, in theory, have been Bellicose, or any one of the many shell entities of which Martorello is president. Nonetheless, given that Martorello refers in his certification to "my taxation attorneys," it seems that Martorello was their client—a point that Plaintiffs provide no evidence to contest. Martorello Certification ¶ 5 (emphasis added).

Report at 5. In addition, Aranca's counsel, Horton, consistently referred to "Bellicose's" motion for a protective order, implying that Aranca believed Bellicose held all applicable privileges. Second, Martorello says in his certification that he engaged Aranca himself. Martorello Certification ¶ 6. Third, the Engagement Letter indicates that Kairos, a third party led by Martorello, was "retain[ing] A[ranca] to perform certain designated valuation services . . . and to provide [Kairos] with [the] . . . [V]aluation [R]eport." Engagement Letter at 1.

Martorello may be right that Bellicose is unlikely to be the privilege holder, given that it had already been sold to TAC by the time that Martorello contacted Aranca, and there was no apparent interaction between Aranca and TAC after Aranca was engaged. Nevertheless, the evidence that Martorello has submitted does not establish with any certainty that Martorello himself engaged Aranca. Indeed, Martorello relies exclusively on the Engagement Letter to support his argument, but that letter does not identify him as Aranca's client. To the contrary, it plainly states that the agreement for Aranca to complete certain "business valuation services" was "by and between A[ranca] and your company, identified above," which is Kairos. Id. In fact, aside from being addressed to and signed by Martorello as Kairos' president, the Engagement Letter does not reference

Martorello by name at all. Kairos may still be solvent and managed by Martorello, giving him the authority to assert the attorney-client privilege on its behalf. See Weintraub, 471 U.S. at 349-350 ("[T]he corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors"). But it is equally plausible that Kairos, like Bellicose, has been sold or has new management. In any case, Martorello has made no attempt to prove that he currently manages Kairos, instead completely ignoring the distinction between the privilege being possessed by Kairos or by Martorello. Therefore, he has not established that he is the party entitled to assert the privilege.

### 2. Waiver

Furthermore, even if Martorello had standing to assert the privilege, his privilege claim fails because he disclosed the privileged information to Aranca for purposes other than securing legal advice. As the privilege holder, the client can waive otherwise privileged materials by "ma[king] any disclosure of a confidential communication to any individual who is not embraced by the privilege." In re Grand Jury Subpoena, 341 F.3d 331, 336 (4th Cir. 2003) (internal quotations omitted). Where waiver is an issue, the proponent of the privilege bears the burden of showing both "that an attorney-client relationship

23

existed, [and] also that the particular communications at issue are privileged and that the privilege was not waived." Id. at 335.

At the same time, not every disclosure of a confidential communication to a third party destroys the privilege. For instance, courts have consistently held, relying on United States v. Kovel, 296 F.2d 918 (2d Cir. 1961), that a client may convey confidential information to an agent—such as an accountant or tax consultant—without waiving the privilege, as long as that disclosure is made to facilitate the attorney's provision of legal services to the client. See United States v. Adlman, 68 F.3d 1495, 1500 (2d Cir. 1995); United States v. Bornstein, 977 F.2d 112, 116 (4th Cir. 1992); Grand Jury Proceedings Under Seal v. United States, 947 F.2d 1188, 1191 (4th Cir. 1991); Black & Decker Corp. v. United States, 219 F.R.D. 87, 90 (D. Md. 2003); United States v. ChevronTexaco Corp., 241 F. Supp. 2d 1065, 1071-72 (N.D. Cal. 2002). In deciding the application of this "derivative privilege," courts consider several factors, including "to whom was the advice provided—counsel or the client," and "which parties initiated or received the communications." Black & Decker, 219 F.R.D. at 90. The central concern, however, is "the nature of the work performed by the accountant." Id. The communications to the

agent must be "made for the purpose of the [agent] assisting [the client] in the rendition of legal services rather than merely for the purpose of receiving accounting [or tax] advice." Grand Jury Proceedings Under Seal, 947 F.2d at 1191; see also Kovel, 296 F.2d at 922 ("If what is sought is not legal advice but only accounting service, . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists."); Samuels v. Mitchell, 155 F.R.D. 195, 199 (N.D. Cal. 1994) ("If privileged documents or communications are disclosed to accountants for a purpose other than securing legal advice, the privilege is waived.").

Martorello contends that Kovel and its progeny are inapposite here because those cases only apply where a third party acts as an attorney's agent to provide interpretation, not where, as here, a client engages the third party to act as his agent at an attorney's direction. But Martorello misconstrues the way in which Kovel limited its holding. Kovel noted that "it was not presented with the situation of an accountant acting as the client's agent, rather than the attorney's agent, for the purpose of subsequent communication by the accountant to the lawyer." Grand Jury Proceedings Under Seal, 947 F.2d at 1191 (citing Kovel, 296 F.2d at 922 n.4). "In such a situation," the Fourth Circuit has explained, "communications between the client

and his agent made for the purpose of facilitating the rendition of legal services would be covered by the privilege." Id. (emphasis added). As this description makes clear, even where the client rather than the attorney has engaged the agent, the privilege only attaches if the agent's work is intended to help the attorney provide legal services—the precise conclusion reached by Kovel and the cases that have interpreted it. Consequently, those cases are instructive here despite the differences in the identity of the party hiring the agent.[8]

Martorello further asserts that, even if Kovel's rationale applies, he disclosed the confidential communications to Aranca so that it could "assist[] in furthering the legal advice his attorneys were providing," not so that it could give accounting advice. Martorello Reply (ECF No. 12) at 7. According to Martorello, the privilege log reveals that his attorneys were actively involved in helping Aranca, as all parties were working towards the same goal of accurately valuating Bellicose for tax purposes. But this statement does not accurately characterize the privilege log; almost all of the entries are described as

---

[8] Other cases support the conclusion that this distinction is negligible, as they involved situations where the client—not the attorney—initiated the relationship with the agent. See Adlman, 68 F.3d at 1500 (privilege waived if client, not attorney, provided agent with confidential information to obtain tax advice); Grand Jury Proceedings Under Seal, 947 F.2d at 1189-91 (client conferred with accountant and then hired attorney).

either "[e]-mail communication between . . . Martorello and Aranca including . . . Martorello relaying" confidential information, or "[e]-mail communication from . . . Martorello to Aranca forwarding" confidential information. See Privilege Log at 20-22. That language does not imply extensive, or, indeed, any, involvement by Martorello's attorneys. In fact, it suggests the opposite: that Martorello sent, and presumably received, the majority of the communications with Aranca for his personal benefit. This evidence of limited attorney involvement weighs in favor of finding waiver. See Black & Decker, 219 F.R.D. at 90.

Moreover, Martorello's argument focuses on the wrong issue. The determinative factor is that Aranca was engaged for the sole purpose of "perform[ing] certain business valuation services" and "conducting valuation analysis" for Martorello's tax purposes. Engagement Letter at 1; Valuation Report at 5; Martorello Certification ¶ 5. Put differently, Aranca was engaged to better help Martorello understand the effect of the Bellicose sale and the Note on his taxes. Courts have rejected the extension of the attorney-client privilege in similar circumstances. See Adlman, 68 F.3d at 1500 ("If the facts were that [the client] furnished information to [its accounting firm] to seek [the firm]'s expert advice on the tax implications of the proposed transaction, no privilege would apply."); Black &

27

Decker, 219 F.R.D. at 91 ("Given the complexity of the transactions at issue, it is understandable why plaintiff . . . retain[ed] the services of [its agent] to help evaluate the tax and business implications of the transaction. The record does not support the conclusion that [the agent]'s advice—or the documents at issue—were provided primarily to assist the plaintiff's attorneys in rendering legal advice." (emphasis added)). Furthermore, the purpose of Aranca's valuation activities illustrates why Grand Jury Proceedings Under Seal is not analogous to this case. The client in that case consulted with his accountant because he was the subject of a grand jury investigation into his tax returns, and those communications were intended to help the attorney defend the client in the investigation. Grand Jury Proceedings Under Seal, 947 F.2d at 1189, 1191. Here, however, Martorello was not the subject of any investigation or proceeding at the time he engaged Aranca, and he has not identified how Aranca's work helped his attorneys provide legal instead of tax services.

Martorello's reading takes the attorney-client privilege far beyond the narrow scope that the Fourth Circuit has prescribed. The mere fact that an attorney recommended a transaction, as Martorello's attorneys did, "does not place a cloak of secrecy around all the incidents of [that]

28

transaction." <u>Matter of Fischel</u>, 557 F.2d 209, 212 (9th Cir. 1977). And whether Martorello's attorneys helped Aranca evaluate the tax implications is immaterial, since an attorney can fulfill dual roles as an accountant or tax specialist and a lawyer. <u>See</u> <u>Bornstein</u>, 977 F.2d at 117 ("[T]he appropriate inquiry . . . is whether the accountant's workpapers were produced more for the benefit of Bornstein the lawyer or more for the benefit of Bornstein the accountant/tax preparer, that is, whether the accounting services were performed primarily to allow Bornstein to give legal advice."). Martorello has not proven that he did not waive the attorney-client privilege by disclosing his communications to Aranca, <u>see</u> <u>In re Grand Jury Subpoena</u>, 341 F.3d at 336, and his motion to quash falls short.

**B. Work-Product Doctrine**

Martorello also contends that four documents in the privilege log are also protected by the work-product doctrine. That doctrine prevents discovery of documents "prepared in anticipation of litigation," whether by an attorney or a party or its representative. Fed. R. Civ. P. 26(b)(3)(A). "'[M]aterials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes,'" however, are not shielded by the work-product privilege. <u>Solis</u>, 644 F.3d at 232 (quoting <u>Nat'l Union Fire Ins.</u>

Co. v. Murray Sheet Metal Co., 967 F.2d 980, 984 (4th Cir. 1992)). Thus, the documents at issue

> must have been created *because* of the prospect of litigation, when (1) "the [party] faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation," National Union, 967 F.2d at 984, *and* (2) the work product "would not have been prepared in substantially similar form but for the prospect of that litigation." [United States v.] Adlman, 134 F.3d [1194,] 1195 [(2d Cir. 1998)].

RLI Ins. Co. v. Conseco, Inc., 477 F. Supp. 2d 741, 748 (E.D. Va. 2007) (emphasis and alteration in original). The party claiming the work-product privilege bears the burden of showing that the documents were created in anticipation of litigation, and "must come forward with a specific demonstration of facts" in that regard, either through affidavits or a privilege log. Id.; see also Interbake Foods, 637 F.3d at 502. Moreover, as with the attorney-client privilege, the scope of the work-product doctrine is narrowly construed. ePlus Inc. v. Lawson Software, Inc., 280 F.R.D. 247, 251 (E.D. Va. 2012).

Martorello has not shown that the documents noted above were prepared in anticipation of litigation. The privilege log describes each of the first three documents as a "[m]emorandum of legal counsel R. Hackett setting forth historical enforcement information relating to small dollar lending," and the fourth as

30

an attachment to that memorandum. ECF No. 1-1 at 20-22. The log provides no further information, such as the date the memorandum was created, and neither Martorello nor the drafter of the memorandum, Rick Hackett ("Hackett"), has provided an affidavit with more details. Martorello claims that this information is sufficient to implicate the work-product privilege because it shows that the documents were meant to provide legal support for the changes in the valuation of the Note and Bellicose. He further asserts that the memorandum "is clearly meant to advise . . . Martorello as to potential litigation risks." Martorello Reply at 2 n.2.

The evidence provided is insufficient to demonstrate that the memorandum is work product. For a document to have been created in anticipation of litigation, a party must have been "'fac[ing] an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation.'" RLI Ins., 477 F. Supp. 2d at 748 (quoting Nat'l Union, 967 F.2d at 984). Martorello has provided no information about what pending or imminent litigation prompted Hackett to create the memorandum, and the vague, inchoate threat of future litigation based on the complicated sale of Bellicose is not

enough.[9] The memorandum appears to contain an assessment of general litigation risks related to the sale, which would be called for with any complex transaction. Accordingly, the memorandum is a document prepared in the ordinary course of business, since it would have been created in the same form with or without the prospect of litigation. See Solis, 644 F.3d at 232; RLI Ins., 477 F. Supp. 2d at 748. As a result, the documents in question cannot be withheld as work product.

CONCLUSION

For the foregoing reasons, MATT MARTORELLO'S NOTICE OF MOTION AND MOTION TO QUASH PLAINTIFF'S SUBPOENAS TO ARANCA US, INC. (ECF No. 1) will be denied.

It is so ORDERED.

                                   /s/    _R E P_

                        _____
                        Robert E. Payne
                        Senior United States District Judge


Richmond, Virginia
Date: March 16, 2018

---

[9] This would also be true if the impetus for the memorandum was the possibility that Martorello or one of his companies would be audited. The work-product doctrine can apply where documents are created in connection with an IRS audit or enforcement action. See Black & Decker, 219 F.R.D. at 91; Fed. Election Comm'n v. Christian Coalition, 178 F.R.D. 61, 77 (E.D. Va. 1998). Here, however, there is no indication that the threat of an audit was any greater than the indefinite threat of litigation.